EASTERLY, Associate Judge,
dissenting:
No sight of drugs. No sight of money. All the citizen saw was an exchange of small, unidentified objects that the citizen “believed ” was a drug transaction. Do we now suspend the Fourth Amendment’s protection against unreasonable searches and seizures and uphold Terry stops[1] based on citizens’ unsupported beliefs?
No, the majority opinion says; there is one critical fact that establishes the requisite reasonable articulable suspicion[2] to allow the police to lawfully stop Mr. Morgan on the street and investigate whether he was dealing drugs: The citizen told the police that Mr. Morgan “reach[ed] into the back of [hisj pants and pull[ed] something out, put it back in.” In other words, the *1241 majority opinion’s sole basis for upholding this stop is a citizen’s description of an action one might innocently take to retrieve from one’s back pocket one’s phone, or wallet, or MetroCard, or work ID, or a business card, or a comb, or a tissue, or a cough drop. The majority opinion concludes, however, that the citizen was not describing anything so innocuous. Instead, the citizen “naturally” must have meant that he saw Mr. Morgan reaching into the waistband of his pants or even his crotch area. I cannot agree.
When the government seeks to justify a seizure as a permissible investigative detention under the Fourth Amendment pursuant to Terry v. Ohio, it must demonstrate that there were “specific and ar-ticulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.” Peay, 597 A.2d at 1319-20 (quoting Terry, 392 U.S. at 21, 88 S.Ct. 1868); Upshur v. United States, 716 A.2d 981, 983 n. 3 (D.C.1998) (“The prosecution has the burden of ‘prov[ing] by a preponderance of the evidence that ... the stop ... w[as] constitutionally permissible.’ ” (quoting Mayes v. United States, 653 A.2d 856, 861 (D.C.1995))). The “central inquiry” is whether, “given the totality of the circumstances at the time of the seizure, the police officer could reasonably believe that criminal activity was afoot.” Duhart v. United States, 589 A.2d 895, 897 (D.C.1991).
Where, as here, a police officer observes no suspicious activity by a defendant firsthand, and relies instead on a tip from a citizen, the suspected criminal activity must be “describefd] ... in sufficient detail.” See Brown v. United States, 590 A.2d 1008, 1017 (D.C.1991) (quoting Rushing v. United States, 381 A.2d 252, 256-57 (D.C.1977)). See also Florida v. J.L., 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (requiring that “a tip be reliable in its assertion of illegality”). Thus, it is the police officer’s obligation to confirm that what the citizen saw constituted “unusual conduct ” which would lead the officer “to reasonably conclude in light of his experience that criminal activity may be afoot.” See Duhart, 589 A.2d at 899 (quoting Terry, 392 U.S. at 30, 88 S.Ct. 1868) (emphasis in original). But if the information the police receive from a citizen amounts to nothing more than the citizen’s “inchoate and unparticularized suspicion or ‘hunch’ of criminal activity,” see Illinois v. Wardlow, 528 U.S. 119, 123-24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (quoting Terry, 392 U.S. at 27, 88 S.Ct. 1868), a seizure cannot be validated under Terry.
In this case, the government presented only minimal evidence about what the citizen reportedly observed of Mr. Morgan’s suspected drug dealing. According to the officer who responded to the citizen’s call, the citizen saw Mr. Morgan and another individual exchange unidentified objects, but nothing in the record indicates that the citizen saw any money, and the citizen explicitly told the officer that the citizen did not see any drugs.[3] The citizen did not report any conversation between Mr. Morgan and the other man. The citizen did not report that Mr. Morgan and the other man tried to conceal their actions. The majority implicitly concedes that, even when examined in the light most favorable to the government, see Bennett v. United States, 26 A.3d 745, 751 (D.C.2011), these facts — which are much like the facts presented in Duhart[4] — are “capable of too *1242 many innocent explanations,” Duhart, 589 A.2d at 899, and thus cannot justify the seizure in this case.
The majority opinion upholds the stop based on its determination that the citizen’s 'report of seeing Mr. Morgan “reaching into the back of his pants” is aloné á sufficiently suspicious action to justify a Terry stop. The majority opinion acknowledges that this general observation could refer to innocuous behavior and could simply mean that Mr. Morgan was reaching into a back pocket. But the majority opinion dismisses this interpretation as ‘'[unjnatural,” and then asserts that “the more natural” interpretation is that the citizen meant that he saw Mr. Morgan reaching into the “waistband” or perhaps even the “crotch” area of his pants — or at least that this was the police officer’s reasonable understanding of where Mr. Morgan was reaching. With the substitution of “waistband” or “crotch” for “back of the pants,” the majority confirms that the police had reasonable articulable suspicion to stop Mr. Morgan.[5]
But is that substitution legitimate? On a purely semantic level, I am not convinced that “back of the pants” is synonymous with “waistband” or “crotch.”[6] I readily *1243 agree that it is noteworthy when an adult in a public place reaches into the waistband or crotch area of his or her pants— which is why I think that, if that were what the citizen had seen, that is what the citizen would have said it saw. The fact that the citizen only generally described Mr. Morgan reaching into the back of his pants makes it seem far more likely that the citizen either did not observe a more unusual action or was not in a position to observe precisely where Mr. Morgan had reached.[7]
But I also question the majority opinion’s analytic approach. This court’s obligation to review the facts in the light most favorable to the government does not authorize us to take ambiguously described conduct, sweep aside all benign explanations, and settle on the most nefarious possibility so that we might find reasonable' articulable suspicion. Instead, “[a]n inquiry into reasonable suspicion looks for the exact opposite of ambiguity: objective and particularized indicia of criminal activity.” United States v. Beauchamp, 659 F.3d 560, 571 (6th Cir.2011); accord Powell v. United States, 649 A.2d 1082, 1089 (D.C.1994) (“Drawing alb reasonable inferences in favor of sustaining the trial court’s ruling does not, and in fact, can not, require this court to ignore the teachings of Terry, which require that a police officer point to ‘specific and articulable’ facts to establish a reasonable suspicion to justify [a stop and frisk].”). This, of course, was the rationale of Duhart: We declined to allow actions “capable of too many innocent explanations” to form the basis of reasonable articulable suspicion. Duhart, 589 A.2d at 899. Similarly, in Jackson v. United States, 56 A.3d 1206 (D.C.2012), we found a “logical gap” between the actions the police observed and their conclusion that the defendant was dangerous and thus held that “the ambiguous movement in this case cannot be the decisive fact justifying a frisk that was otherwise unwarranted.” Id. at 1211-12 (citing Powell, 649 A.2d at 1091 (Farrell, J., concurring)).[8]
*1244 The logical gap in this case cannot be filled by the majority opinion’s assertion that, even if “waistband” or “crotch” was not what the citizen meant, “it would be objectively reasonable to understand the citizen’s statement” to have this meaning. That my colleagues in the majority are the first to arrive at this understanding undercuts their assessment of its reasonableness. Not only did the officer never testify that he understood the citizen’s statement in that way, the government at trial never argued, and the trial court never found, that the citizen’s general statement about Mr. Morgan’s actions could reasonably and exclusively be interpreted to describe a suspicious reaching into his waistband or crotch area.
In addition, the majority opinion’s willingness to “reasonably” interpret ambiguously described conduct to arrive at reasonable articulable suspicion is improper in that it relieves both the police and the prosecution of the burden of fulfilling well-established obligations.
First, the police should not have unquestioningly credited the citizen’s belief that the citizen had witnessed a drug transaction. Nor should the police have initiated a Terry stop on the basis of a citizen’s vague report of conduct that encompassed myriad innocent actions. Rather, it was the duty of the police to investigate — to seek more particularized information when the citizen gave only general information about the alleged criminal activity (as the investigating officer did, for example, when he confirmed that the citizen had not in fact seen any drugs). See United States v. Thomas, 211 F.3d 1186, 1192 (9th Cir.2000) (“A hunch may provide the basis for solid police work; it may trigger an investigation that uncovers facts that establish reasonable suspicion.... A hunch, however, is not a substitute for the necessary specific, articulable facts required to justify a Fourth Amendment intrusion.”). In Thomas, the Ninth Circuit determined that “if a police officer relies on information from another government agency [the FBI] in making an investigatory stop, that information must itself be based on reasonable suspicion. The officer cannot simply defer to the other agency’s suspicion without establishing the articulable facts on which that suspicion is based.” Id. at 1189 (citation omitted); accord Milline v. United States, 856 A.2d 616, 619 (D.C.2004) (citing United States v. Hensley, 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)) (explaining that “[a]n officer may rely on a police lookout as the basis for such an investigatory stop provided that the lookout itself was based upon a reasonable articulable suspicion that its subject has committed an offense”); Bryant v. United States, 599 A.2d 1107, 1112 n. 9 (D.C.1991) (“That the arrest team was entitled to rely on the information transmitted is beyond question. But the scope of justifiable reliance is limited by the objective information imparted.” (citation omitted)). By the same token, to conduct a lawful Terry stop of Mr. Morgan, the police could not solely rely on a vague description of conduct merely “believed” by a citizen to be criminal, even if that citizen was an employee of the Department of Homeland Security and a reliable source of information.[9]
*1245 Second, it was the prosecution’s obligation to present evidence at the suppression hearing to demonstrate that the police had reasonable articulable suspicion. The prosecution could have tried to elicit additional evidence that it was reasonable, .under the circumstances, for the investigating officer to have understood “back of the pants” as “waistband” or “crotch area”; but the prosecution presented no such evidence. Indeed, it did not focus at all on the officer’s testimony about the citizen’s vague reference to Mr. Morgan reaching into the back of his pants. Instead it generally argued that, based on the information the officer received from the citizen, the police had enough information to support a reasonable articulable suspicion that Mr. Morgan had engaged in a hand-to-hand drug transaction.
The prosecution made its record. The record it made did not support the conclusion that what the citizen reportedly saw gave the police reasonable articulable suspicion to believe Mr. Morgan had engaged in a drug transaction. This court should not fill the gaps in the prosecution’s evi-dentiary presentation by putting words in the citizen’s mouth and interpreting vague reports of innocuous conduct as suspicious. To the contrary, now more than ever courts must hold firm on reasonable artic-ulable suspicion. “[T]he exclusionary rule is our sole means of ensuring that police refrain from engaging in unwanted harassment or unlawful seizure of anyone— whether he or she is one of the most affluent or most vulnerable members of our community.” United States v. Foster, 634 F.3d 243, 249 (4th Cir.2011). The predictable consequence of the majority opinion’s holding — that a citizen’s vague report of someone reaching into the back of his pants alone can support reasonable articulable suspicion — is more Terry stops. Police may happen upon more drug dealers, but surely they will also stop more people who are innocent of any wrongdoing. This court may never see those cases,[10] but we cannot ignore the fact that such stops have significant costs, both individual and societal — costs which, in my view, further underscore the absence of reasonable articulable suspicion in this case.[11] I respectfully dissent.

. Terry v. Ohio, 392 U.S. 1, 19-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. See Peay v. United States, 597 A.2d 1318, 1319-20 (D.C.1991) (en banc).

. The police officer "asked the citizen ... if it saw drugs and the citizen was clear, no, [it] didn’t see drugs, it just believes it might be drugs based upon the totality of the circumstances it observed."

. In Duhart we held that an. officer did not have an adequate basis to justify a Terry stop where he
*1242 did not even observe a - one-way transfer of money or an object appearing to be drugs. Nor was there a particularized fact from which .the [officer] could conclude that what transpired had some connection with drugs. Sergeant Tompkins was 25 feet away from appellant when he observed him displaying ‘'something” to another person. He did not see the object, could not tell what it was, never testified that he thought the object looked like drugs or drug packaging, and he observed no transfer of the object or of anything else. The officer simply observed two individuals standing on a sidewalk examining an object; he did not even testify, as the judge found, that the two people were having a conversation.
Duhart, 589 A.2d at 899 (citations omitted). We concluded that "[tjhere is nothing ‘unusual' or even mildly ‘suspicious’ about such activity, which must occur as a matter of course between individuals every day, and there are innumerable innocent explanations for such behavior.” Id.

. The majority appears to assume that the reaching into the back of the pants (now .waistband or crotch) was part of the exchange of small objects. But there is no indication in the record that whatevér Mr. Morgan-retrieved from the back of his pants was the source of the “small, object” he exchanged. Indeed, the officer’s testimony never put the report of the exchange and the report of the man reaching into the back of the pants in temporal order, thus it is unclear which action preceded the other. The officer first testified that the citizen told him about the exchange of unidentified objects. Some time and five pages of transcript later, the officer testified that the citizen reported that "during the course of the suspected drug transaction” the citizen had seen Mr. Morgan "reach into the back of [his] pants and pull something out [and] put it back in.”

. The majority opinion cites United States v. Scott, 987 A.2d 1180 (D.C.2010), to demonstrate that these terms are commonly used “interchangeably.” But the passage it cites indicates that a police officer actually observed the defendant reach "into the waistband of his pants and pull out a single ziplock bag containing a white rock substance, which he handed to [a] woman in exchange 'for cash.” Id. at 1185 (internal quotation'marks omitted). The court in Scott later referred more generally to the fact that "[a]n undercover officer saw [the defendant] reach into the back of his pants at the waist to retrieve a ziplock of apparent crack cocaine.” Id. at 1198. The fact that the court went from a specific to a more general description in discussing this action does not support the assertion that the more general "naturally" and necessarily means the more specific. -
Similarly, in Mothersell v. City of Syracuse, 289 F.R.D. 389 (N.D.N.Y.2013), it was clear, that the detective who had successfully executed a drug raid of a home actually saw the defendant not just " ‘fidgeting’ with the back of his pants” but also “attempting to stick his fingers inside the waistband of his pants and underwear.” Id. at 398-99. And a subsequent reference to the defendant’s effort “to reach down into the back of his pants,” id. at 399, in no way supports the majority opinion’s determination that every reference to *1243 reaching into the back of one’s pants necessarily refers to a reach into one’s waistband or crotch area.
The majority opinion also cites Donaldson v. State, 416 Md. 467, 7 A.3d 84 (2010), but that case does not support the majority opinion's interchangeability argument, because the officer in Donaldson only testified that he saw the defendant reach into the back of his pants. Id. at 89. Based on a totality of the circumstances analysis, the court determined that the officer had probable cause to arrest • the defendant, but the totality of the circumstances included the officer's observation of the defendant walking into an alley with four other individuals, retrieving a clear plastic bag containing several small, white objects, removing of some of these objects from the bag, and receiving money in exchange for them. Id. at 89, 95.

. The police officer testified that the citizen had described being "pretty close” while observing the exchange of small objects, but the fact that the citizen was unable to identify the objects exchanged suggests that "pretty close” was actually some distance away, and at the suppression hearing the government never asked whether the officer got more specific information about the citizen’s distance or vantage point, or whether his view was obstructed.

. This argument is not contrary to or even in tension with Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), and Umanzor v. United States, 803 A.2d 983 (D.C.2002). The point is not that any "ambiguity is fatal to reasonable articulable suspicion” or that all "possibility of innocent behavior” must be ruled out before a court can uphold a Terry stop. But there is a limit. The "Fourth Amendment requires at least a minimal level of objective justification for making the stop,” Wardlow, 528 U.S. at 123, 120 S.Ct. 673; accord Umanzor, 803 A.2d at 992 — which justification is lacking if ambiguous conduct is "capable of too many innocent explanations.” Duhart, 589 A.2d at 899.

. In particular, this court should not excuse the failure of the police to investigate and to seek out more precise information where, as here, the citizen's report concerned past criminal activity, and there was no crime or danger to be averted and no need for swift decision-making. See Hensley, 469 U.S. at 228, 105 S.Ct. 675 (explaining that the reasonableness analysis is "somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct,” because "the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing”).

. “Searches that result in no weapons or contraband being found do not — as a practical matter — -make it to the courthouse door.” United States v. McKoy, 402 F.Supp.2d 311, 314 (D.Mass.2004), aff'd, 428 F.3d 38 (1st Cir.2005); see also Foster, 634 F.3d at 248-49 (“[T]hese matters generally only come before this Court where a police seizure uncovers some wrongdoing....”).

. “If Terry becomes an automatic [stop and] frisk rule in practice, the Fourth Amendment rights of citizens ... will be eviscerated.” McKoy, 402 F.Supp.2d at 316.